Ryan D. Dreveskracht, admitted *pro hac vice*
ryan@galandabroadman.com
Galanda Broadman, PLLC
PO Box 15146
Seattle, WA 98115
(206) 557-7509
Attorney for Plaintiffs

Mark Kramer, OSB No. 814977
mark@kramer-associates.com
Kramer & Associates
520 SW 6th Ave #1010
Portland, OR 97204
(503) 243- 2733
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ROBERT DALE HANINGTON and ROBIN HANINGTON, Personal Representatives of the Estate of William B. Hanington; ROBERT DALE HANINGTON, in his personal capacity; ROBIN HANINGTON, in her personal capacity; A.H., by and through Guardian *ad Litem*, ROBIN HANINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>MULTNOMAH COUNTY, a municipality; MICHAEL REESE, in his personal capacity; MICHAEL SHULTS, in his personal capacity; STEVEN J. ALEXANDER, in his personal capacity; CURTIS SANDERS, in his personal capacity; RAI ADGERS, in his personal capacity; RACHEL SCHNEIDER, in her personal capacity; BRIAN EPIFANO, in his personal capacity; CYNTHIA MCKNIGHT, in her personal capacity; ANGELINA PLATAS, in her personal capacity; TRUDY KAME, in her personal capacity; CHARLOTTE HASSON, in her personal capacity; JOHN and JANE DOES 1-17, in their personal capacities,<br><br>Defendants. | Case No.: 3:19-cv-01533-BR<br><br><br><br><br><br><br><br><br><br>AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

AMENDED COMPLAINT                    1

COMES NOW the above-named Plaintiffs, by and through attorneys Mark Kramer, Kramer & Associates, and Ryan Dreveskracht, Galanda Broadman, PLLC, and by way of claim alleges upon personal knowledge as to themselves and their own actions, and upon information and belief upon all other matters, as follows:

## I.    INTRODUCTION

1.    Neither jails, their employees, nor their subcontractors are allowed to gamble needlessly with the safety of inmates.

2.    If they do, and an inmate is injured or dies, the inmate and/or his or her family is entitled to full compensation for the harms and losses caused.

3.    Here, because Defendants violated this safety rule in numerous instances, William B. Hanington ("William") was severely injured and died as a result.

4.    Plaintiffs are entitled to be compensated for the harms and losses that the Defendants have caused.

## II.    PARTIES

5.    ROBERT DALE HANINGTON and ROBIN HANINGTON are the Personal Representatives of the Estate of William B. Hanington ("Estate") (Multnomah County Circuit Court Case #19PB06124). This is an action arising from William's wrongful and unnecessary death and the Defendants' negligence, gross negligence, and deliberate indifference to William's serious medical condition and conditions of confinement. The claims herein include all claims for damages available under Oregon and federal law to William, his Estate, and all statutory and actual beneficiaries, including his spouse and minor daughter.

6.    ROBERT DALE HANINGTON is William's father. He brings suit in his Personal Capacity and is entitled to damages for the loss of his son.

AMENDED COMPLAINT                    2

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

7.    ROBIN HANINGTON is William's wife.  She brings suit in her Personal Capacity and is entitled to damages for the loss of her husband.

8.    A.H. is William's minor daughter.  She brings suit in her Personal Capacity, by and through her guardian *ad litem*, ROBIN HANINGTON, and is entitled to damages for the loss of her father.

9.    Defendant MULTNOMAH COUNTY ("County") is a municipal corporation responsible for administering adult corrections programs, including operation of the Multnomah County Inverness Jail ("Jail").  The Jail is a medium security adult corrections facility responsible for providing proper custody, control, and supervision for county, state, and federal inmates in Multnomah County.  County is also responsible for providing a safe and healthy environment for detainees and inmates within its custody, including appropriate and necessary protection measures and medical and mental health care.  Jail personnel are considered "Correctional Professionals" who are supposed to demonstrate competency, accountability, ethics, and pride in their work.

10.    Defendant MICHAEL REESE is the County Sheriff.  He supervised, administrated, and managed all County employees and corrections facilities at the time of William's injuries, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training.  Defendant Reese was responsible for the training, supervision, and discipline of County employees and/or agents, including the below individually named defendants and Does 1 through 17.

11.    Defendant MICHAEL SHULTS is the County's Chief Deputy of Corrections.  Defendant Shuls supervised, administrated, and managed all County corrections facilities at the time of William's injuries, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training.  Defendant Shuls was responsible for the training,

AMENDED COMPLAINT                              3

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

supervision, and discipline of corrections employees and/or agents, including the below individually named defendants and Does 1 through 17.

12.    Defendant STEVEN J. ALEXANDER is the Jail Captain who supervised, administrated, and managed the Jail at the time of William's injuries, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training.  Defendant Alexander was responsible for the training, supervision, and discipline of corrections employees and/or agents, including the below individually named defendants and Does 1 through 17.

13.    Defendant CURTIS SANDERS is the Lieutenant who managed and supervised the Jail at the time of William's injuries, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training.  Defendant Morrison was responsible for the supervision and discipline of Jail employees and/or agents, including the below individually named defendants and Does 1 through 17.

14.    Defendant RAI ADGERS is the Commander who was responsible for ensuring the presence and implementation of proper policies, procedures, and established practices at the Jail.

15.    Defendants REESE, SHULTS, ALEXANDER, SANDERS, and ADGERS shall hereinafter be referred to collectively as "Supervisory and Policymaking Defendants."  They were at all times state actors.

16.    Defendants RACHEL SCHNEIDER, BRIAN EPIFANO, CYNTHIA MCKNIGHT, ANGELINA PLATAS, TRUDY KAME, and CHARLOTTE HASSON are employees or subcontractors of the County.  They were at all times state actors.  These Defendants knew that William was (1) in the need of medical care; (2) suicidal; (3) in the midst of a mental health crisis; and/or (3) was housed in unconstitutional conditions of confinement.  In spite of this knowledge, these Defendants took no steps to prevent serious injury and/or death to William.

AMENDED COMPLAINT                     4

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

These Defendants were negligent; deliberately indifferent; and/or acted in furtherance of an official and/or *de facto* policy or procedure of deliberate indifference.  These Defendants are sued in their personal capacities.

17.     Defendants JOHN DOES 1 - 17 (hereinafter "Defendants Doe") are subcontractors, employees, and/or agents of the County.  These Defendants are persons who knew that William was (1) in the need of medical care; (2) suicidal; (3) in the midst of a mental health crisis; and/or (3) was housed in unconstitutional conditions of confinement.  In spite of this knowledge, these Defendants took no steps to prevent serious injury and/or death to William.  Each Defendant Doe was negligent; deliberately indifferent; acted in furtherance of an official and/or *de facto* policy or procedure of deliberate indifference; and/or were responsible for the promulgation of the policies and procedures and permitted the customs/practices pursuant to which the acts alleged herein were committed.  The identities of Defendants Doe unknown at this time and will be named as discovery progresses.

## III.    JURISDICTION AND VENUE

18.     This action arises under ORS 30.020 (Wrongful Death) and the Constitution and laws of the United States, including 42 U.S.C. § 1983.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in the District of Oregon pursuant to 28 U.S.C.§ 1391(b)(1) and (b)(2).  Multnomah County is located in the District of Oregon, and the events and omissions giving rise to the claims in this action occurred in this district.

20.     A Notice of Tort Claim has been properly and timely filed with the County.

AMENDED COMPLAINT                                5

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## IV.    FACTS

21.    William was booked into the Jail on August 8, 2017, for two outstanding warrants. The arrest report filed by the arresting Washington County Deputy Sheriff reads as follows, in relevant part:

| CHARGES | | | | |
|---|---|---|---|---|
| REFERRED TO<br>MULTNOMAH COUNTY DETENTION CENTER | | ADVISED OF RIGHTS?<br>YES | RESISTED ARREST?<br>NO | ASSAULTED OFFICER?<br>NO |
| CASE NUMBER | ORS / ORD<br>WARRANT | CHARGE / WARRANT NO.<br>WARRANT SERVICE / CR01-17-375 / PAROLE VIOLATION - F. #2016101218, OTHER-STATE | BAIL<br>$0 | COURT DATE / TIME |
| CASE NUMBER | ORS / ORD<br>WARRANT | CHARGE / WARRANT NO.<br>WARRANT SERVICE / CR01-17-375 / FAIL TO REGISTER AS A SEX OFFENDER - F. #CR01-17-375, OTHER-STATE | BAIL<br>$0 | COURT DATE / TIME |

22.    Because Multnomah County did not ensure that the Jail Intake Assessment that was supposed to be filled in by the arresting Deputy, it auto-populated as "NO" to each of the inquiries:

| JAIL INTAKE ASSESSMENT | |
|---|---|
| Arresting Officer: **WIMBERLY #37808 - USM** (*Not Filled in*) | |
| NO | 1. Did this arrestee engage in any assaultive or violent behavior with you or others? |
| NO | 2. Has your search of this arrestee uncovered any dangerous contraband such as drugs or weapons? |
| NO | 3. Are you aware of a need to keep this arrestee separated from other persons housed in this facility? |
| NO | 4. Are you aware of this arrestee's consumption or use of a potentially dangerous level of drugs and/or alcohol? |
| NO | 5. Are you aware if this arrestee has been to the hospital or treated by Paramedics/Fire in the last 24 hours? |
| NO | 6. Has this arrestee demonstrated any behaviors that might suggest mental illness to you? |
| NO | 7. Did you notice any indication that this arrestee seemed incapable of understanding and following simple instructions? |
| NO | 8. Did this arrestee engage in behaviors that suggested to you that he/she may be suicidal? |
| NO | 9. Do you have any information that causes you to be concerned that this arrestee may engage in self-harming behavior? |
| NO | 10. Do you have any other information that you believe may assist this agency in the care and/or custody of this arrestee? |

23.    The arresting Deputy did, in fact, have information that would cause a reasonable officer to believe that William would engage in self-harming behavior: the fact that he was a sex offender.

24.    The County's own suicide prevention training materials list previous sex offences as a known contributing factor to in-custody suicides.

MC_004083

AMENDED COMPLAINT                                6

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

25.     It is obvious to any jailer exercising his or her professional judgment that sex offenders are subject to inmate retaliation while in custody and must therefore be identified as a "Special Needs Inmate" necessitating "close supervision" (15-minute watches), simply due to the nature of the offence.

26.     At 2:20 p.m., Defendant Schneider, who is not health trained, conducted William's initial booking interview and completed the associated jail intake assessment form as follows:

| Booking Deputy: **SCHNEIDER #57442** (*08/08/2017 1420 hrs*) | |
|---|---|
| NO | 11. Are there any high risk institutional alerts on file for this arrestee? |
| NO | 12. Are you having suicidal thoughts? |
| NO | 13. Have you been in the hospital or treated by Paramedics/Fire in the past 24 hours? |
| NO | 14. Did this arrestee come in with any prescribed medications? |
| NO | 15. Is there a need for an immediate evaluation of this arrestee by medical staff or a custody supervisor? |

27.     At 4:30 p.m., Defendant Epifano, who is not health trained, _____ classification interview, assessment, and criminal history check, filling out the form as follows:

MC_000027

| | CLASSIFICATION TRIAGE |
|---|---|
| Deputy: **EPIFANO #49638** (*08/08/2017 1630 hrs*) | |
| YES | 1. Do you have a serious medical condition that may require attention while you are here? *Action Taken:* **diabetic** |
| NO | 2. Are you currently taking prescription medication that may need continuation while you are here? |
| NO | 3. Do you have a serious mental health condition that may require attention while you are here? |
| NO | 4. Have you been hospitalized for mental health care within the last year? |
| NO | 5. Have you ever attempted suicide? |
| NO | 6. Are you currently thinking about suicide? |
| NO | 7. Have you recently ingested potentially dangerous levels of drugs and/or alcohol? |
| NO | 8. Have you ever experienced DT's or other serious withdrawal symptoms from drugs or alcohol? |
| NO | 9. Do you have any type of disability that will require assistance or will impact your ability to understand instructions while you are here? |
| NO | 10. Are you aware of any reason you should be separated from another inmate while you are here? |
| NO | 11. Have you ever required protective custody or segregation from another inmate while incarcerated? |
| NO | 12. Are you now, or have you been in the past affiliated with a gang? |
| YES | 13. Do you understand how to obtain medical care while you are here? |
| YES | 14. Have you understood the questions I have asked you? |
| YES | 15. Have you provided us with all the information that you want us to be aware of while you are here? |
| YES | 16. Does the Screening Deputy feel that the arrestee is capable of understanding all the questions asked? |
| NO | 17. Does the arrestee have any institutional history alerts? |
| NO | 18. Does the Screening Deputy feel the arrestee should be referred to a supervisor for review? |
| NO | 19. Is there any indication that the arrestee is reacting so negatively toward his charge that he may engage in self-harming behavior? |
| NO | 20. Are you gay, lesbian, bi-sexual, transgender, intersex or gender non-conforming? |
| NO | 21. Do you feel, for any reason, that you may be particularly susceptible to being a victim of sexual abuse while you are here? |

AMENDED COMPLAINT                          7

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

| ASSESSMENT CENTER | |
|---|---|
| Deputy: **EPIFANO #49638** (*08/08/2017 1633 hrs*) | |
| NO | 1. Is this your first time booked into jail? |
| YES | 2. Have you been held in any other jail?<br>*Where*: **Ada County, Idaho** |
| YES | 3. Have you spent time in Prison?<br>*Where*: **Idaho-10 years** |
| NO | 4. Have you ever received a write-up or misconduct? |
| NO | 5. Have you ever been accused of either escaping, or attempting to escape? |
| NO | 6. Have you ever been a victim of sexual assault while incarcerated? |
| NO | 7. Are you a veteran of the United States Armed Forces? |
| **EPIFANO #49638** completed a Criminal History Check on **08/08/2017** at **1632 hrs** | |
| ID:  Enticing a minor over the internet, failure to register sex offender, pcs, resist arrest, minor consumption of alcohol | |

28.    Defendant Epifano's assessment of William, conducted pursuant to the County's constitutionally deficient policy, fell far below the applicable standard of care. MC_000028

29.    A correct assessment would not simply ask the inmate if he or she is suicidal and take them at their word.  Rather, an adequate assessment would take into account both acute and chronic suicide risk factors and arrive at a standardized suicide risk score.  This would be based upon not only self-report, but any available collateral sources as well (medical and mental health records).  Known collateral sources should be obtained and the inmate's assessment should be updated, as appropriate, as soon collateral sources can be reviewed.  The County has been on notice for years that its assessment protocol is inadequate but has deliberately refused to take steps to implement a constitutionally sufficient assessment.

30.    Here, for example, Defendant Epifano was informed that William had recently been incarcerated for a period of ten years.  Had Defendant Epifano obtained collateral sources from William's previous incarceration, it would have been discovered that William was *in fact* previously diagnosed with anxiety disorder and bipolar, and *in fact* had previously attempted suicide.

AMENDED COMPLAINT                    8

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

31.     At 4:41 p.m., Defendant Epifano recommended William for housing in "dorm 14 to get acclimated again."

32.     Roughly two hours later, at 6:42 p.m., Defendant McKnight completed a similarly neglectful medical and mental health screening.    Relying solely on self-report, Defendant McKnight indicated as follows in William's medical record:

**Mental Health Subjective:**

Client has a mental health diagnosis. No
Client has a history of mental health treatment or psychiatric hospitalization.  No
Client has history of suicide attempts. No
Client is thinking about killing one's self. No
Client's family member or significant other has attempted or committed suicide. No
Client has experienced a significant loss within the last six months such as loss of job, loss of relationship, death of loved one or family member.
Client lacks support of family or friends. No
Client has a history of drug or alcohol abuse. No
This is the Client's first incarceration. No

**Objective:**

**Mental Health Observations:**

Arresting or transporting officer believes that patient may be a suicide risk.  No
Collateral information, including any information collected outside of the patient interview, suggests that patient may be at risk for suicide. No
Client appears to be coherent but refuses to answer questions. No
Client expresses extreme shame, guilt, embarrassment, or feelings of humiliation as a result of charges or incarceration. No
Client is expressing feelings of hopelessness. No
Client appears to lack reasonable coping strategies for passing time in jail. No
Client exhibits signs or reports symptoms of depression. No
Client appears overly anxious, panicked, afraid, or angry. No
Client shows signs of possible psychosis or reports that they are seeing/hearing things that other people don't see or hear. No
Client appears to be under the influence of drugs or alcohol. No
If YES does it appear that Client is currently or will soon likely experience withdrawal? No

_ 205

33.     Of course, there was no "collateral information" that indicated that William was at risk for suicide, since Defendant McKight made no efforts to obtain that information, despite knowledge that William had previously been incarcerated for years in Idaho and was released only roughly 1 year ago.

34.     The standard of care for medical intake requires that the clinician obtain collateral information, but Defendant McKnight chose not to take this crucial step.

35.     In addition, because William was diabetic, any reasonable medical professional exercising his or her professional judgement would obtain and review "past health records" within

AMENDED COMPLAINT                    9

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

2-24 hours. *See, e.g.,* NCCHC J-E-02; ACA 1-CORE-4C-07; American Diabetes Association, Standards of Medical Care in Diabetes (2007).

36.    Rather than taking these steps, Defendant McKnight simply assigned William to "Dorm 18 housing for medical observation."

37.    Inmates housed in Dorm 18 are known to have health problems and a higher need for observation and supervision.  They are categorized by formal Jail policy as "unstable" and "unpredictable."

38.    Dorm 18 is the Jail's medical infirmary housing, where inmates are housed in solitary confinement.  Solitary confinement is a well-known and obvious suicide risk factor.  *See, e.g., Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1235 (M.D. Ala. 2017).

39.    Despite the fact that Dorm 18 houses infirm, special management inmates in solitary confinement, the County's written policy does not require more frequent security and welfare checks.  According to the County's written policy, jailers must conduct two security and welfare checks per hour, at irregular intervals, no closer than 15 minutes apart nor further than 50 minutes apart, in dorms 1-18.  The standard of care, however, requires that inmates housed in these conditions be personally observed at least every thirty minutes, on an irregular schedule.

40.    The standard of care also requires that inmates housed in these conditions be allowed at least 35 square feet of unencumbered space, a standard that the cell in Dorm 18 that William was housed in did not comply with.

41.    Formal County's jail policy does not require that an inmate be psychologically cleared prior to isolation housing, as required by national standards.

42.    It was noted upon William's transfer to the infirmary by Defendant Charlotte Hasson that William was "diabetic type 1."

AMENDED COMPLAINT                          10

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

43.     Defendant Platas reviewed this information and approved William's housing in the medical observation unit for "routine medical needs (TA098)."

B.     HEALTHCARE

44.     The death by suicide of William was tragic and could have been prevented by standard approaches to medical and mental health care management.

45.     The policies, established procedures, and protocols in place at the Jail-maintained vis-à-vis its Supervisory and Policymaking Defendants-put William and all other similarly situated patients at an increased risk of serious harm and death.

46.     That these policies, established procedures, and protocols would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

47.     The County-vis-à-vis its Supervisory and Policymaking Defendants-also failed to adequately train its employees, resulting in a condition that put William and all other similarly situated patients at an increased risk of serious harm and death.

48.     That this failure to train would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

49.     The scope of a medical or mental health provider's duty to a patient is determined by the standard of care.  Here, the medical and mental health staff was indifferent to the medical needs of William, and that indifference was indicative of a pattern of fallowing below the standard of care in dealing with the needs of patients.

50.     William would have not died at the time and in the manner that he did, had Jail medical and mental health staff not been indifferent to William's needs.

AMENDED COMPLAINT                              11

51.     Jail medical and mental health staff's indifference to William's serious medical and mental health needs was ratified by Supervisory and Policymaking Defendants.

52.     Despite knowledge of William's serious medical needs, including regular doses of insulin medication, Jail medical staff failed to administer and attend to William in the early morning of August 9, 2017.  As a result, William went into diabetic shock and was in a state of excruciating pain and mental bewilderment.

C.     **CONDITIONS OF CONFINEMENT**

53.     Defendant Kame conducted a welfare check on William at 5:37 a.m.

54.     At roughly 6:00 a.m., on August 9, 2017, William hung himself with a sheet that he fished over the upper hinge on an access door at the back of his cell.

55.     This was a well-known tie-off point, similar to others that had been used in other suicides and attempted suicides at the Jail.

56.     Defendant Kame found William hanging by a ligature, appearing unconscious, just under forty minutes later, at 6:19 a.m.

57.     This failure to conduct monitoring in accordance with national standards was commonplace, especially in August of 2017, when it was more often the case than not that safety checks for special management inmates were not completed every thirty minutes at irregular intervals.

58.     Instead of immediately rendering aid, Defendant Kame called over her radio "medical back-up to dorm 18, there's one hanging" and waited for other jailers or medical personnel to arrive.

59.     Other jailers arrived first.  As one of them described the position of William's body at the time:

AMENDED COMPLAINT                          12

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

His body was in a sitting position; his buttocks appeared to be supported by the floor, and his back was supported by the cemented frame of the bed, in an arched sort of way. His head appeared to be somewhat lifted by the outstretched towel or bed sheet. The color of his skin appeared to be white, with a hint of blue hue.

60.     Defendant Kame did not have a rescue tool on her person, neither did the other jailers.

61.     Because they did not have a rescue tool, they could not get the ligature loose from William's neck. Thereafter, medical personnel arrived, with a rescue tool.

62.     Medical personnel handed the rescue tool to a jailer, who used it to cut the sheet from William's neck.

63.     Medical personnel provided William with CPR.

64.     Medical personnel connected an automated external defibrillator to William, and a heartbeat was detected.

65.     Within a couple of minutes, fire and ambulance personnel also arrived on scene.

D.     **COUNTY POLICY AND ESTABLISHED PRACTICE – *MONELL*, SUPERVISORY, AND POLICYMAKING LIABILITY**

66.     Defendant Kame did not have a rescue tool on his person when he found William hanging from a ligature.

67.     Hanging is the most common form of successful suicide in jails.  This is well-known and was in fact known by the County and its Policymaking and Supervising Defendants.

68.     Reasonable and prudent jailers and jail administrators possess or make available for their subordinates relatively inexpensive rescue tools:



AMENDED COMPLAINT                    13

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

69.     Defendant Kame's failure to possess this type of tool and the County's failure make this type available to her, constitutes negligence and deliberate indifference.

70.     Defendant Kame's possession of this tool would have prevented William's extended period of hanging and saved his life.

71.     All of the acts and omissions taken in regard to the care and custody of William were in accordance with the County's established practices and/or were ratified by the Policymaking and Supervisory Defendants.

72.     It is a common and widespread practice at the Jail to ignore information related to suicidality and healthcare in a measured attempt to avoid liability in a deliberate indifference action, by claiming a lack of knowledge.

73.     The County has a policy of placing inmates in solitary confinement, without a mental health assessment, regardless of whether the inmate's healthcare or mental healthcare needs contraindicated such confinement.

74.     Reasonable and prudent jailers and jail administrators also do not utilize cloth-type sheets, which inmates can easily hang themselves with.  The County and its Policymaking and Supervisory Defendants usage of cloth-type sheets, in the face of other suicides wherein cloth-type sheets were utilized, constitutes negligence and deliberate indifference.

75.     Segregation and similar types of confinement are well known by prudent jail administrators to have exceedingly injurious effects on an inmate's mental health-which is why a policy of housing mentally ill inmates in segregation without first adequately assessing risks to an inmate's mental health is never allowed; it poses a unnecessary risk of harm to inmates.

76.     As recently articulated by the U.S. District Court for the Eastern District of New York in *United States v. D.W.*:

AMENDED COMPLAINT                    14

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Solitary confinement, generally speaking, is the practice of socially isolating a prisoner from the general inmate population and depriving him or her of most environmental stimuli.  It has long been used as a form of punishment. Prisoner isolation is also adopted in response to safety concerns; inmates who are at risk of harm are segregated from the general population for their own protection.  Even though non-punitive, inmates in "protective custody"-as this form of isolation is known-experience the same deprivations as prisoners separated for punitive purposes. . . . Solitary confinement is punishment taken to the extreme. . . . Solitary confinement induces the bleakest depression, plunging despair, and terrifying hallucinations. . . . If these inmates didn't have mental health issues before they entered solitary, they do now. . . . After even relatively brief periods of solitary confinement, inmates have exhibited symptoms such as hypersensitivity to stimuli, perceptual distortions and hallucinations, increased anxiety, lack of impulse control, severe and chronic depression, appetite and weight loss, heart palpitations, sleep problems, and depressed brain functioning. . . . [T]he restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning-even causing "confusional psychosis" in some inmates. . . . Research has demonstrated that time served in solitary confinement can lead to serious mental illness in healthy individuals. It significantly exacerbates the condition of those already suffering from emotional instabilities. . . . In solitary confinement ordinary stimuli become intensely unpleasant and small irritations become maddening. Individuals in such confinement brood upon normally unimportant stimuli and minor irritations become the focus of increasing agitation and paranoia. . . . [C]ountless individuals in solitary confinement . . . have become obsessively preoccupied with some minor, almost imperceptible bodily sensation, a sensation which grows over time into a worry, and finally into an all-consuming, life-threatening illness. . . . [I]nmates with pre-existing mental illnesses are likely to suffer the most severe consequences from isolation.

No. 13-0173, 2016 WL 4053173, at *46, *60-63 (E.D.N.Y. Jul. 28, 2016) (quotation and citation omitted).

77.    What is more, "[t]he effects of solitary confinement do not end when an individual is released":

Experts point to solitary confinement as a form of "social death" . . . which can lead to the permanent harm of "a continued intolerance of social interaction" that prevents an inmate from reintegrating into the larger prison population and into society.  This continuing effect is likely to intensify the risk of harm to the public posed by a newly released inmate who has served time in solitary confinement[.]

*Id.* at *63 (quotation and citation omitted).

AMENDED COMPLAINT    15

78.     The County and its Policymaking and Supervisory Defendants were also negligent and deliberately indifferent when they failed to adequately train individual Defendants.  Upon information and belief, these individual Defendants failed to perform their duties as described in this Complaint due to inadequate training.  The County and its Policymaking and Supervisory Defendants knew that the County's training inadequately instructed its employees, but did nothing to change this policy.

79.     The County and its Policymaking and Supervisory Defendants failed to adequately train officers and employees in suicide prevention.

80.     The County and its Policymaking and Supervisory Defendants failed to train officers and employees in suicide prevention policies and procedures.

81.     The County and its Policymaking and Supervisory Defendants failed to train officers and employees to properly monitor and to protect inmates.

82.     The County and its Policymaking and Supervisory Defendants failed to train officers and employees to properly identify and monitor at-risk inmates.

83.     The County and its Policymaking and Supervisory Defendants failed to train officers and employees in in-take procedure.

84.     The County and its Policymaking and Supervisory Defendants failed to enforce policies and procedures for suicide prevention, including, but not limited to, policies and procedures for prisoner in-take, confiscation of dangerous items from prisoners, and monitoring of prisoners.

85.     The County and its Policymaking and Supervisory Defendants failed to enforce the aforesaid policies and procedures by disciplining officers and employees or by other means.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

86.    The County and its Policymaking and Supervisory Defendants caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures.

87.    The County and its Policymaking and Supervisory Defendants maintained inadequate suicide prevention policies and procedures which, failed to identify and/or monitor at-risk detainees.

88.    The County and its Policymaking and Supervisory Defendants maintained inadequate in-take policies and procedures, which failed to identify at-risk detainees, permitted dangerous items to remain with detainees, and failed to identify and monitor prescription medication and treatment.

89.    The County and its Policymaking and Supervisory Defendants maintained inadequate monitoring and safety check systems.

90.    The County and its Policymaking and Supervisory Defendants maintained a policy of placing inmates into a remote cell with ready means to commit acts of self-harm, without adequate review by a mental health provider prior to such a placement.

91.    The County and its Policymaking and Supervisory Defendants failed to create systems of information sharing, communication, and clearly delineated roles and lines of authority for county jail staff and its subcontractors.

92.    The County and its Policymaking and Supervisory Defendants failed to properly supervise their contracted employees.

93.    The County and its Policymaking and Supervisory Defendants failed to provide sufficient resources to provide for the necessary medical care for physically or mentally ill inmates.

AMENDED COMPLAINT                17

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

94.     The County and its Policymaking and Supervisory Defendants maintained a policy of ignoring inmate requests for health care, mental health care, medication, and help with depression and self-harm.

95.     The County and its Policymaking and Supervisory Defendants maintained a policy of using cursory mental health and suicide screening that essentially amounted to no screening at all for incoming inmates.

96.     The County and its Policymaking and Supervisory Defendants maintained a policy of not regularly monitoring inmates.

97.     The County and its Policymaking and Supervisory Defendants maintained a policy of policy of ignoring and refusing to implement relatively inexpensive suicide prevention measures.

98.     The County and its Policymaking and Supervisory Defendants maintained a policy of permitting employees to provide clearly inadequate suicide prevention care.

99.     The County and its Policymaking and Supervisory Defendants maintained a policy of permitting employees to provide clearly inadequate medical care.

100.    The County and its Policymaking and Supervisory Defendants maintained a policy of underfunding that resulted in understaffing, economy-grade subcontractors, an inability to implement additional suicide precautions, and undertraining.

101.    The County and its Policymaking and Supervisory Defendants failed to adequately staff the Jail facility.

102.    The County and its Policymaking and Supervisory Defendants have implemented a custom of improperly indemnifying, and of conspiring to indemnify jailers, for punitive damages

AMENDED COMPLAINT                    18

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

assessed against those jailers by juries in civil rights cases, and this practice was a moving force that caused the violations of William's rights, as alleged herein.

103.    The County's official policies remained static from 2015 to 2017.    This, in and of itself created a significant risk of serious harm.    The danger in lack of a more frequent review of policies is that they are not kept current with the emerging body of knowledge that guide most competent corrections officials.    Whether standards have changed as a result of litigation or due to advancements in correctional knowledge, policies without frequent review are behind the times and inadequate to provide sufficient guidance to facility staff, as is the case with the policies of the Jail.

104.    A death in a correctional facility is a very serious incident.    A death by suicide or diabetes complications typically causes an incident review to occur which includes a complete accounting of what happened, what lessons can be learned from the event and what changes need to be made in order decrease the likelihood that it occur again. Had County officials had an adequate policy in place to review previous incidents of deaths by suicide or diabetes complications, accommodations could have been made that would have kept William safe and alive.

105.    Nothing is more fundamental in corrections work than regular safety checks to make sure the inmates are safe.    The County and its Policymaking and Supervisory Defendants failed to have the appropriate policy in place in this regard.    Had the County and its Policymaking and Supervisory Defendants kept their policies updated to reflect common correctional practices and standards, William's death would have been prevented.

106.    Each of the above policies and established practices amounts to negligence and deliberate indifference to the known and/or obvious risk of suicide and serious medical and safety

AMENDED COMPLAINT                              19

needs of at-risk detainees, including William.

107.    County employees and subcontractors deliberately did not comply with formal

policies and national standards, which evidences their deliberate indifference and negligence.  *See*

*Salter v. Booker*, No. 12-0174, 2016 WL 3645196, at *12 (S.D. Ala. June 29, 2016) ("Defendants

acted with deliberate indifference when they failed to enforce or follow the written jail policies

and procedures put in place to protect suicidal prisoners.").

108.    Defendants are not even trying; they have been negligent, grossly negligent, and

have showed deliberate indifference to the medical and safety needs of the inmates at the Jail.  This

includes, again, failing to have and follow proper training, policies, and procedures for the care

and treatment of people in the Jail.  It also includes a cold-hearted attitude on the part of staff and

subcontractors, who ignore medical and safety harms as they present and who turn a blind eye and

a deaf ear to people who have serious medical and safety needs.

109.    Each and every individually named Defendant had knowledge that a substantial

risk of serious harm existed as to William's health and safety.  The County and its Policymaking

and Supervisory Defendants had knowledge that their policies, customs, and/or protocols created

a substantial risk of serious harm as to William's health and safety.  But even if Defendants did not

have knowledge of the risk of harm, the risk created by their policies, customs, and/or protocols-

and lack thereof/lack of training thereon/lack of funding to implement-was obvious in light of

reason and the basic general knowledge that Defendants are presumed to have obtained regarding

the type of deprivation.

110.    The acts and omissions caused by Defendants through their policies, practices,

customs-including inadequate staffing, training, preparation, procedures, supervision, and

discipline-were a proximate cause of William's pain, suffering, death, and Plaintiffs' damages.

AMENDED COMPLAINT                        20

E.    CAUSE AND MANNER OF DEATH

111.    According to emails, while William was dying the County was frantically "try[ing] to pressure" other entities to quash his warrants, so they would not "be billed for the hospital charges."

112.    Per the County's request, the warrants were quashed on or around noon on August 10, 2017.

113.    At 11:58 a.m., a County employee emailed: "Done! Release is entered in the computer."

114.    At the time, Defendant Alexander's mind was on public relations, damage control, and defending a potential lawsuit.

115.    At 1:58 p.m. on August 10, 2017—while William was still fighting for his life—

From:        ALEXANDER Steven J
Sent:        Thursday, August 10, 2017 1:58 PM CDT
Defendant Alexander emailed the following draft Press Release to the County's Public
Subject:     Draft release - MCIJ incident

Communications Sergeant:

Here's a draft of a release, modify as you wish, just to give you an idea/example of how to put it together. Whatever you end up with if, when, the person passes away at the hospital, should be cleared through Odil and run by CD Shults prior to pushing out.

Inmate found unresponsive at Multnomah County Inverness Jail

On Wednesday August 9, 2017 at approximately 5:20 a.m. a Corrections Deputy conducting a routine security and welfare check in a dorm at the Multnomah County Inverness Jail discovered an inmate unresponsive in his cell. The deputy called for medical response and with responding deputies and on site medical staff entered the cell and began life-saving efforts. Emergency Responders from Portland Fire Bureau and AMR arrived and continued efforts to revive the inmate. The inmate, William Blaine Hanington, Age 32, of Portland, OR was transported to the hospital as life-saving efforts continued. Mr. Hanington was released from custody at the hospital on August 10, 2017 after fugitive holds were dropped from Idaho. Mr. Hanington passed away at the hospital on xx August xx, 2017.

Multnomah County Sheriff's Office detectives are conducting a full investigation, which is routine practice for a death in custody or in this type of incident. There is no indication of foul play. No further information is available at this time.

There is no reason to say the manner in which he was found unresponsive, you can tell a reporter if they call, but this spares the family from having it in the release.

AMENDED COMPLAINT                    21

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

116.    Approximately a month after William's death, County Detective Keith Krafve wrote to County Lieutenant Chad Gaidos: "The [County] M[edical] E[xaminer] may or may not be involved in this case. . . . [L]ikely tort claim coming."

117.    Despite the fact that William's death was caused by an apparent in-custody suicide, no investigation into the cause and manner of William's death vis-à-vis an autopsy was conducted by the County Medical Examiner.

118.    The County's failure to conduct an investigation into the cause and manner of William's death vis-à-vis an autopsy violated ORS 146.090 and the County's own policy, which requires that "[i]f the death occurs at a hospital, an autopsy is performed by the Medical Examiner."

119.    Upon information and belief, the County and its Supervisory and Policymaking Defendants intentionally violated ORS 146.090 in order to subvert Plaintiffs' "likely tort claim."

120.    The cause and manner of William's death were not conclusively determined because of the County and its Supervisory and Policymaking Defendants' failure to comport with the law.

121.    This constitutes negligence, gross negligence, and deliberate indifference.

122.    William's death by suicide and Defendants' failure to adequately diagnose, treat, and supervise him caused his death.

123.    In the alternative, William's death was caused by complications from diabetes and Defendants' failure to adequately diagnose, treat, and supervise him.

124.    In the alternative, William's death was caused by a combination of complications from diabetes and suicide, and Defendants' failure to adequately diagnose, treat, and supervise him.

AMENDED COMPLAINT                    22

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

125.    Because Defendants intentionally violated ORS 146.090, Plaintiffs are entitled to an inference as to cause of death.

F.    DAMAGES

126.    William was 33 years old at the time of his death.  He left behind grieving parents, a loving wife, and a beautiful 3 year-old baby girl.   Plaintiff Robert Hanington incurred $1500 in cremation expenses and Plaintiff Robin Hanington will incur $500 for urn to hold Williams' ashes and  have a proper ceremony performed to memorialize his death.

127.    The aforesaid acts and omissions of Defendants deprived William of his right to be free from cruel and punishment and to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution; directly caused and/or directly contributed to his pain, suffering, and a general decline of his quality of life; directly caused and/or directly contributed to cause his death; directly caused and/or directly contributed to cause his family to suffer loss of services, companionship, comfort, instruction, guidance, counsel, training, and support; and directly caused and/or directly contributed to cause his family to suffer pecuniary losses, including but not limited to medical and funeral expenses.

128.    Prior to death, William suffered extreme physical and mental pain, terror, humiliation, anxiety, suffering, and emotional distress.

129.    William's death was completely unnecessary and could have been easily prevented via provision of even the most basic medical care and treatment.

## V. CLAIMS

A.    FIRST CAUSE OF ACTION – NEGLIGENCE – WRONGFUL DEATH (ORS 30.020)

130.    Defendants had a duty to care for inmates and provide reasonable safety and medical and psychiatric care.

AMENDED COMPLAINT                        23

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

131.    This duty extends to foreseeable self-inflicted harms and includes protecting inmates against suicide.

132.    This duty extends to foreseeable medical harms and includes protecting inmates from diabetes-related injuries.

133.    This duty exists because prisoners, by virtue of incarceration, are unable to obtain medical and psychiatric care for themselves.

134.    Defendants breached this duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the assessment of persons with apparent medical and psychiatric needs.

135.    Defendants breached that duty, and were negligent, when they failed to adequately treat William's medical and psychiatric needs.  Indeed, because William's medical and psychiatric needs were entirely ignored, Defendants were grossly negligent.

136.    Defendants breached that duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the provision of reasonable and necessary medical and psychiatric care and treatment to inmates.

137.    Defendants breached that duty, and were negligent, when they failed to ensure adequate and proper medical staffing at the Jail.

138.    Defendants breached that duty, and were negligent, when they failed to ensure that William was properly supervised and/or that cell checks were conducted in a safe, timely, and consistent manner.

139.    Defendants breached that duty, and were negligent, when they failed to ensure that William received adequate medication.

AMENDED COMPLAINT                    24

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

140.    Defendants breached that duty, and were negligent, when they ignored notification of William's serious physical and mental health conditions and suicidality.

141.    Defendants breached that duty, and were negligent, when they failed to properly assess and treat William prior to his death.

142.    As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, William either committed suicide or died due to untreated physical ailments.

143.    William suffered unimaginable pre-death pain, suffering, embarrassment, and terror.

144.    As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, Plaintiffs have incurred and will continue to incur economic damages as specified above of $1500 and $500 and noneconomic damages in an amount to be determined at trial.

145.    As a direct and proximate result of the negligence of Defendants, William's mother, father, wife, and child have suffered the loss of familial association with William.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of William's wrongful death.

**B.    SECOND CAUSE OF ACTION – 42 U.S.C. § 1983**

146.    The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

147.    At the time William was detained by the County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions

AMENDED COMPLAINT                              25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates.

148.    Being subjected to unnecessary physical and mental pain and suffering is simply not part of the penalty that criminal offenders pay for their offenses against society.  As a result, municipalities and Jail officials are liable if the they know that an inmate or inmates face a substantial risk of serious harm and callously disregards that risk by failing to take reasonable measures to abate it.

149.    Here, Defendants knew that William faced a substantial risk of suicide, yet callously disregarded that risk by failing to take reasonable measures to abate it.

150.    Here, Defendants knew that William faced a substantial risk of harm or death due to his serious medical condition, yet callously disregarded that risk by failing to take reasonable measures to abate it.

151.    Here, Defendants knew that William was suffering from physical and mental illness, yet callously disregarded these afflictions by failing to take reasonable measures to abate them.

152.    Having an inmate in custody creates a duty of care that must include enough attention to mental health concerns that inmates with obvious symptoms receive medical attention. Defendants had numerous opportunities to meet their responsibilities to help William, but no one did.  One cannot avoid responsibility by putting one's head in the sand.

153.    Here, the County and its Policymaking and Supervising Defendants and  knew of and callously disregarded the excessive risk to inmate health and safety caused by the County's inadequate formal and informal policies, including a lack of training, funding, and supervision.

AMENDED COMPLAINT                    26

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

154.    The County and its Policymaking and Supervising Defendants knew of this excessive risk to inmate health and safety because it was obvious and because numerous other inmates had been injured and/or killed as a result of these inadequacies in the past.

155.    The County and its Policymaking and Supervising Defendants were responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient safety and medical and mental health care, and training thereon, which placed inmates like William at substantial risk.

156.    There was little to no supervision of William and inmates like him because the County and its Policymaking and Supervising Defendants maintained a known policy and custom of understaffing and overcrowding.

157.    While it appears that the County did have a suicide prevention policy, the County's actual policy was to ignore the written policy-written policy intended to protect inmates from the foreseeable consequences of not following the written policy, including death by suicide and/or diabetic complications.

158.    The County also has an impermissible policy of a using cursory mental health screenings and "check-box determinations" to determine that mentally ill inmates are not a danger to themselves.

159.    The County had an unwritten policy of understaffing and indifference to inmate supervision that was maintained with deliberate indifference.  The County and its Policymaking and Supervising Defendants know that the Jail is understaffed and that their employees often have trouble completing all of their duties as a result of this understaffing.  Yet these Defendants failed to take any steps to correct these inadequacies.

AMENDED COMPLAINT                    27

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

160.    The Defendants' lack of clear delineation of authority and inadequate means of communication with respect to assessing risks of suicide and diabetes was an additional policy that caused jailers' failure to prevent William's pain, suffering, and death.  In essence, there is a "who's on first" problem at the Jail where an established practice of non-communication to one another or amongst themselves in regard to inmate suicidality and safety has been implemented.

161.    Defendants were subjectively aware that William was suicidal, in the midst of a mental health crisis, and/or in need of medical assistance because of a serious medical condition. From this evidence, a reasonable jailer and/or healthcare provider would have been compelled to infer that a substantial risk of serious harm existed.  Indeed, Defendants did infer that a substantial risk of serious harm existed, but failed to take any steps to alleviate this risk.  And William died as a result.

162.    Upon information and belief, Defendants displayed deliberate indifference when they ignored requests from other inmates and/or healthcare providers to treat William's mental and physical health care, depression, and self-harm needs.

163.    "The requirement of deliberate indifference is less stringent in medical needs cases . . . because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns.  Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs."  *Lyons v. Busi*, 566 F. Supp. 2d 1172, 1191 (E.D. Cal. 2008) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

164.    Defendants had a policy, custom, and practice of denying treatment; these policies, customs, and practices posed a substantial risk of serious harm to the inmates in the jail, including William, and Defendants knew that its policies, customs, and practices posed this risk.

AMENDED COMPLAINT                              28

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

165.    Defendants knew of a number of previous suicides, incidences of self-harm, and complications from diabetes, yet deliberately did nothing to provide its personnel with adequate training to prevent future suicides, incidences of self-harm, and complications from diabetes, Instead, Defendants acquiesced in a long-standing policy and custom of inaction.

166.    Indeed, even without the previous in-custody deaths, it was obvious that a total lack of training to appropriately address mentally and physically ill inmates would result in the harm caused here. The County and its Policymaking and Supervising Defendants were expressly informed that its official policies were being ignored and that its unofficial or de facto policies would result in inmate deaths, yet deliberately did nothing to address these unofficial or de facto policies.

167.    Indeed, the County had numerous opportunities to obtain training to appropriately address physically and mentally ill inmates, but knowingly and deliberately declined to obtain it.

168.    The County has consistently failed to attend to the serious medical needs of inmates.  The County and its Policymaking and Supervising Defendants knew that there were successful suicides and diabetic-related emergencies in recent years, and that there were relatively inexpensive prevention measures available.  Yet the County and its Policymaking and Supervising Defendants did not employ any of these measures.  In addition, these defendants knew that its employees were not providing adequate suicide prevention care or diabetic care, but continued to employ them nonetheless.

169.    Defendants knew of and callously disregarded the excessive risk to inmate health and safety caused by their failure to provide reasonable and necessary medical care and treatment.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

170. Defendants knew of and callously disregarded the excessive risk to inmate health and safety caused by their failure to have and follow polices and procedures for suicide screening and prevention.

171. This callousness reflects a custom, pattern, and/or policy wherein the jail either intentionally violated or was deliberately indifferent to the health, welfare, and civil rights of William and his fellow inmates.

172. As a direct and proximate result of the deliberate indifference of Defendants, as described above and in other respects as well, William died a terrible and easily preventable death. He suffered pre-death pain, anxiety, and terror, before going into diabetic shock, asphyxiated, and leaving behind a loving family.

173. As a direct and proximate result of the deliberate indifference of Defendants, Plaintiffs-William's wife, daughter, and father-have each suffered the loss of familial association with William, in violation of their Fourteenth Amendment rights. Plaintiffs, each of them, have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of William's death.

174. Defendants have shown reckless and callous disregard and indifference to inmates' rights and safety and are therefore subject to an award of punitive damages to deter such conduct in the future.

## VI.    JURY DEMAND

175. Plaintiff hereby demands a trial by jury.

## VII.    AMENDMENTS

176. Plaintiff hereby reserves the right to amend this Compliant.

AMENDED COMPLAINT                    30

## VIII.   RELIEF REQUESTED

177.    Damages have been suffered by all Plaintiffs and to the extent any state law limitations on such damages are purposed to exist, they are inconsistent with the compensatory, remedial and/or punitive purposes of 42 U.S.C. § 1983, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

178.    WHEREFORE, Plaintiff requests a judgment against all Defendants:

      (a)    Fashioning an appropriate remedy and awarding economic and noneconomic damages, including damages for pain, suffering, terror, loss of consortium, and loss of familial relations, and loss of society and companionship pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be determined at trial;

      (b)    Awarding punitive damages;

      (c)    Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as otherwise available under the law;

      (d)    Declaring the defendants jointly and severally liable;

      (e)    Awarding any and all applicable interest on the judgment; and

      (f)    Awarding such other and further relief as the Court deems just and proper.

Respectfully submitted this 21st day of May, 2020.

GALANDA BROADMAN, PLLC

s/Ryan D. Dreveskracht

Ryan D. Dreveskracht, WSBA #42593
Attorney for Plaintiffs, admitted *Pro Hac*
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com

AMENDED COMPLAINT                    31

KRAMER & ASSOCIATES

s/Mark Kramer
Mark Kramer, OSB # 814977
Attorney for Plaintiffs
520 SW Sixth Avenue #1010
Portland, OR 97204-1595
mark@kramer-associates.com

AMENDED COMPLAINT                     32