IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**ROBERT DALE HANINGTON**, in his
personal capacity and in his capacity as
Personal Representative of the Estate of
William B. Hanington, **ROBIN
HANINGTON**, in her personal capacity and
in her capacity as Personal Representative of
the Estate of William B. Hanington, and
**A.H.**, by and through Guardian ad Litem,
**ROBIN HANINGTON**,

        Plaintiffs,

    v.

**MULTNOMAH COUNTY**, a municipality,
**MICHAEL REESE**, in his personal
capacity, **RACHEL SCHNEIDER**, in her
personal capacity, **BRIAN EPIFANO**, in his
personal capacity, **CYNTHIA MCKNIGHT**,
in her personal capacity, **TRUDY KAME**, in
her personal capacity, **STEVEN J.
ALEXANDER**, in his personal capacity,
**JOHN AND JANE DOES 1–17**, in their
personal capacities, **MICHAEL SHULTS**, in
his personal capacity, **CURTIS SANDERS**,
in his personal capacity, **RAI ADGERS**, in
his personal capacity, and **CHARLOTTE
HASSON**, in her personal capacity,

        Defendants.

Case No. 3:19-cv-01533-MO

OPINION & ORDER

**MOSMAN, J.,**

    The plaintiffs in this case are family members of William Hanington and the personal

representatives of his estate. William Hanington died by suicide after being held at Multnomah

County Inverness Jail. The Haningtons allege that Defendants—Multnomah County and a slew

1 – OPINION & ORDER

of its employees—are responsible for Mr. Hanington's death. They contend Defendants'

policies, actions, and inactions violated Mr. Hanington's right to due process under the

Fourteenth Amendment and constituted negligence under Oregon common law. Am. Compl.

[ECF 23] ¶¶ 130–74.

       This matter comes before me on Defendants' motion for summary judgment [ECF 53].

Defendants seek to dismiss the Haningtons' entire case. Though I dismiss most of the

Haningtons' claims, I find they have identified a genuine dispute of material fact as to whether

Nurse McKnight acted negligently in her evaluation of Mr. Hanington. As a result, I grant and

deny the motion in part.

## BACKGROUND

       In August 2017, Mr. Hanington was arrested on a warrant for failing to register as a sex

offender. Pedro Decl. [ECF 55] Ex. 1. The arresting marshal took him to Multnomah County

Detention Center (MCDC). Weiner Decl. [ECF 54] Ex. 1 at 2. Evidence indicates that the

marshal filled out only part of the jail intake assessment. Dreveskracht Decl. [ECF 64] Ex. 2 at 2

(stating "Not Filled In"). MCDC's system ostensibly populated the form automatically,

answering all questions with "No." *Id.*; *see also* Mot. for Summ. J. [ECF 53] Ex. G at 34:20–21

(discussing auto-population).

       At MCDC, Mr. Hanington met with Deputy Rachel Schneider, who conducted an initial

booking interview. Deputy Schneider had started working for MCDC earlier that year.

Dreveskracht Decl. [ECF 64] Ex. 7 at 11:14–17. At the time of Mr. Hanington's arrest, she had

completed several months of field training and had received suicide prevention training. *Id.* at

10:12–11:17; Mot. for Summ. J. [ECF 53] Ex. A at 7:6–14. However, she had yet to receive full-

time academy training. Dreveskracht Decl. [ECF 64] Ex. 7 at 11:1–2. As part of her initial

booking interview, Deputy Schneider asked Mr. Hanington whether he had been having suicidal

thoughts. Dreveskracht Decl. [ECF 64] Ex. 2 at 2. He said that he had not. *Id.*

      Mr. Hanington then proceeded to an interview with Deputy Brian Epifano. Deputy

Epifano had received suicide intervention training in May 2017. Mot. for Summ. J. [ECF 53] Ex.

G at 13:4–18. The purpose of this interview was to determine what kind of dorm classification

would best fit Mr. Hanington's needs. *Id.* at 7:5–11. Deputy Epifano asked Mr. Hanington

whether he had ever attempted suicide. Dreveskracht Decl. [ECF 64] Ex. 2 at 3. Mr. Hanington

said that he had not. *Id.* He also denied having suicidal thoughts or a serious mental health

disorder. *Id.* Based on Mr. Hanington's disclosure that he was diabetic and his request to be

placed in a single cell, Deputy Epifano recommended he be assigned to a single-cell dormitory in

Multnomah County Inverness Jail (MCIJ). *Id.* at 2–3; Mot. for Summ. J. [ECF 53] Ex. G at

10:1–11:1.

      Deputy Epifano described Mr. Hanington's demeanor throughout the interview as

"jovial," "respectful," "polite," and "forthcoming." *Id.* at 3:4–6. Unfortunately, Mr. Hanington

had not been forthcoming about everything: he did not disclose that he had attempted suicide as a

teenager or that he had been diagnosed with bipolar disorder. Dreveskracht Decl. [ECF 64] Ex. 2

at 3; *id.* Ex. 27 at 2.

      Following the classification interview, Mr. Hanington received a medical assessment

from Nurse Cynthia McKnight. Relying in part on Mr. Hanington's self-reported answers, Nurse

McKnight recommended that Mr. Hanington not be placed on suicide watch. Dreveskracht Decl.

[ECF 64] Ex. 17 at 2; Mot. for Summ. J. [ECF 53] Ex. H at 5:8–11, 8:5–9. Nurse McKnight

noted Mr. Hanington had high blood sugar, which she treated with insulin. Weiner Decl. [ECF

54] Ex. 5 at 10. Concerned about Mr. Hanington's insulin levels, Nurse McKnight recommended

transfer to the medical dorm at MCIJ for observation. Mot. for Summ. J. [ECF 53] Ex. H at 15:20–16:10.

When Mr. Hanington arrived at MCIJ, he received a quick screening from a sergeant, and a nurse on duty reviewed his file. *Id.* Ex. J at 5:9–23; *id.* Ex. K at 2:4–21. At 8:45 p.m., he was placed into his medical observation cell. Dreveskracht Decl. [ECF 64] Ex. 23 at 3.

Deputy Trudy Kame was on security duty for the second half of the night. Mot. for Summ. J. [ECF 53] Ex. L at 2:2–20. Twice per hour, Deputy Kame checked on Mr. Hanington's dormitory. *Id.* at 2:19–20. She noted he was awake the whole night. *Id.* at 2:20–24. At one point, Deputy Kame asked Mr. Hanington whether he was okay; he nodded. *Id.* at 3:2–6. When Deputy Kame conducted her security check at approximately 5:37 a.m., Mr. Hanington was alive and well. *Id.* at 4:9–12; Weiner Decl. [ECF 72] Ex. 4 at 1.

At 6:18 a.m., Deputy Kame checked Mr. Hanington's cell again. Weiner Decl. [ECF 72] Ex. 4 at 2. She saw Mr. Hanington sitting motionless on the floor, with a sheet tied around his neck. Mot. for Summ. J. [ECF 53] Ex. L at 4:22–5:2. Deputy Kame called for backup, which arrived roughly 30 seconds later. *Id.* at 5:3–15; Weiner Decl. [ECF 72] Ex. 4 at 3. Deputy Kame and her backup entered the cell and cut Mr. Hanington down. Mot. for Summ. J. [ECF 53] Ex. L at 5:16–19. Despite the efforts of the deputies and medical personnel, Mr. Hanington died several days later from the injuries he sustained from his hanging. Dreveskracht Decl. [ECF 64] Ex. 46.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court

must view the facts in the light most favorable to the nonmoving party and draw all reasonable

inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

The moving party bears the initial burden of informing the court of the basis of its motion and

providing evidence that demonstrates the absence of a genuine issue of material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the nonmoving party must

"present significant probative evidence tending to support its claim or defense." *Intel Corp. v.*

*Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (internal quotation omitted).

The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of

matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (citation and internal quotation marks omitted).

## DISCUSSION

### I.    The § 1983 Claims

#### A.  Which Amendment Applies

In the Haningtons' amended complaint, they allege Defendants violated the Fourteenth

Amendment. Am. Compl. [ECF 23] ¶¶ 127, 147, 173. In their motion, Defendants argue that the

Eighth Amendment rather than the Fourteenth Amendment applies here because Mr. Hanington

was "in custody on a parole warrant stemming from a judicially imposed sentence." Mot. Summ.

J. [ECF 53] at 17–18 (citing *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021)).

Which amendment applies is a critical question. In *Kingsley v. Hendrickson*, the Supreme

Court held that a pretrial detainee alleging excessive force in violation of the Fourteenth

Amendment need not show that the officers were subjectively aware they had used excessive

force. 576 U.S. 389, 395 (2015). Instead, a pretrial detainee need only show that the officers' use

of force was "objectively unreasonable." *Id.* at 396–97. The Ninth Circuit has applied this

standard in similar contexts, including inadequate medical care. *Castro v. Cnty. of L.A.*, 833 F.3d

1060, 1069–70 (9th Cir. 2016); *Gordon v. Cnty. of Orange (Gordon I)*, 888 F.3d 1118, 1124–25

(9th Cir. 2018). At bottom, if the Fourteenth Amendment applies, the Haningtons must show that

Defendants acted with *objective* deliberate indifference. *Gordon I*, 888 F.3d at 1124–25. But if

the Eighth Amendment applies, the Haningtons must meet the higher standard of *subjective*

deliberate indifference. *Id.* at 1125 n.4 (citing *Castro*, 833 F.3d at 1070–71).

     The Ninth Circuit's most extensive discussion on the question is in an unpublished case,

*Flores v. Mesenbourg*, No. 95-17241, 116 F.3d 483, 1997 WL 303277 (9th Cir. June 2, 1997)

(table). There, the panel found that the Eighth Amendment applied to an individual held on a

parole violation because the conditions of parole were imposed as a result of his prior conviction.

*Id.* at *1. Relying on *Flores*, this district and the Central District of California have found that

individuals arrested on parole violations are convicted prisoners rather than pretrial detainees.

*Nordenstrom for Est. of Perry v. Corizon, Health, Inc.*, No. 3:18-cv-01754-HZ, 2021 WL

2546275, at *7 (D. Or. June 18, 2021); *Jensen v. Cnty. of L.A.*, No. CV 16-01590 CJC, 2017 WL

10574058, at *7 (C.D. Cal. Jan. 6, 2017).

     However, in a more recent opinion, the Ninth Circuit has suggested a contrary position,

referring to an individual accused of a probation violation as a pretrial detainee. *See Ressy v.

King Cnty*, 520 F. App'x 554, 555 (9th Cir. 2013) (unpublished).[1] Likewise, other circuits have

generally found that individuals arrested for suspected parole violations are pretrial detainees

---

[1] Though the plaintiff in *Ressy* was a probationer and the plaintiff in *Flores* was a parolee, that distinction is immaterial. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (finding no "difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation").

subject to the Fourteenth Amendment. *See Martin v. Warren Cnty., Ky.*, 799 F. App'x 329, 334, 337 (6th Cir. 2020); *Paith v. Cnty. of Wash.*, 394 F. App'x 858, 860 n.2 (3d Cir. 2010); *Hamilton v. Lyons*, 74 F.3d 99, 104–06 (5th Cir. 1996); *Clark v. Poulton*, 963 F.2d 1361, 1364–65 (10th Cir. 1992); *see also Paugh v. Uintah Cnty.*, No. 2:17-cv-01249 JNP, 2020 WL 4597062, at *19–20 (D. Utah Aug. 11, 2020).

I conclude that the Fourteenth Amendment governs Mr. Hanington's § 1983 claims. The Fourteenth Amendment prevents punishment "prior to an adjudication of guilt." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Because pretrial detainees have "not been adjudged guilty of any crime," they cannot be punished until they have received due process. *Id.* at 536–37. Mr. Hanington was arrested on suspicion of violating the conditions of his parole—he had yet to be found to have done so. Though Mr. Hanington was not entitled to a jury trial on his suspected parole violation, he did have a right to a revocation hearing before a judge. *Morrissey v. Brewer*, 408 U.S. 471, 485–86 (1972). Because that hearing had yet to occur, Mr. Hanington had not received the process he was due under the Fourteenth Amendment. Thus, any punishment inflicted on Mr. Hanington based on his alleged parole violation would violate the Fourteenth Amendment. *See Kingsley*, 576 U.S. at 400 ("[P]retrial detainees . . . cannot be punished at all, much less maliciously and sadistically." (internal quotation marks omitted)).[2]

True, Mr. Hanington's parole arrest traces back to his prior conviction. But a parolee's interest in maintaining the freedoms afforded by his parole is a distinct Fourteenth Amendment right. *Morrissey*, 408 U.S. at 482 ("[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others."). That right cannot be taken without due process. *Id.* Therefore the

---

[2] I note that mere detention to ensure a parolee's presence at his revocation hearing "do[es] not amount to punishment." *Bell*, 441 U.S. at 536–37.

question is not whether the medical care Mr. Hanington received was cruel and unusual

punishment. Instead, the question is whether that medical care was punishment at all. *Bell*, 441

U.S. at 535.

Medical care constitutes punishment under the Fourteenth Amendment if it was made—

or denied—with objective deliberate indifference to the detainee's medical needs. *Gordon I*, 888

F.3d at 1124–25. Objective deliberate indifference is "more than negligence but less than

subjective intent—something akin to reckless disregard." *Id.* at 1125 (quoting *Castro*, 833 F.3d

at 1071).

### B.  Claim Against Multnomah County

Under *Monell v. Department of Social Services.*, 436 U.S. 658, 690 (1978), a municipal

entity may be held liable under 42 U.S.C. § 1983. To establish a *Monell* claim against

Multnomah County, the Haningtons must show that it had a "'policy or custom'" that caused Mr.

Hanington's death "through deliberate indifference to his constitutional right to adequate medical

care." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 681 (9th Cir. 2021). The deliberate

indifference inquiry for a § 1983 claim against a municipality is always an objective one. *Castro*,

833 F.3d at 1076. Thus, to establish the County was objectively deliberately indifferent, the

Haningtons must show that the County "had actual *or constructive knowledge*" that its policies

were "'substantially certain' to result in inmates failing to receive the proper treatment, creating

a likelihood of serious injury or death." *Sandoval*, 985 F.3d at 682–83 (quoting *Castro*, 833 F.3d

at 1076) (emphasis added).

The Haningtons claim the County had constitutionally deficient policies or practices in

five different areas: (1) medical and mental health screening; (2) training; (3) security and

welfare checks; (4) suicide intervention; and (5) overcrowding. Resp. to Mot. for Summ. J. [ECF 63] at 29–33. I address each policy area in turn.

### 1. Medical and Mental Health Screening

The Haningtons argue that the County does not take sex offender status into account as a suicide risk and that this policy constitutes deliberate indifference because sex offenders are at a heightened suicide risk. Resp. to Mot. for Summ. J. [ECF 63] at 29; Luethy Decl. [ECF 65] ¶ 4(a)(ii). In the Haningtons' view, a constitutionally sufficient policy would put sex offenders on suicide watch until they receive clearance from a mental health professional. Resp. to Mot. for Summ. J. [ECF 63] at 30.

Contrary to the Haningtons' characterization, County policies list sex offender status as a factor relevant in determining appropriate housing and security measures for detainees. Mot. for Summ. J. [ECF 53] Ex. N at 7; Dreveskracht Decl. [ECF 64] Ex. 3. Moreover, though the County does not automatically put sex offenders on suicide watch until they meet with a mental health professional, no relevant standard of care requires the County to do so. Under standards promulgated by the National Commission on Correctional Health Care (NCCHC), an arriving inmate may be assessed by "mental health-trained correctional staff" if mental health staff is not present. Dreveskracht Decl. [ECF 64] Ex. 29 at 75. These assessments are then reviewed by mental health staff during the next shift they are present. *Id.* The Haningtons point to no other guidance that could have put the County on constructive notice that its screening procedures were substantially likely to result in inmates receiving inadequate treatment. Thus, I must determine whether the County complied with NCCHC screening policies.

There is no evidence that mental health staff were on-site at MCDC when Mr. Hanington arrived, so NCCHC policies dictated that Mr. Hanington receive screening from mental health-

trained correctional staff. *Id.* As defined in the NCCHC handbook, mental health-trained correctional staff are "generally correctional officers or deputies assigned to specific roles in identifying and interacting with individuals in need of mental health services." *Id.* at 76. Included in this category are "officers who provide receiving screening in local jails, officers who administer or deliver mental health medication," and officers who assist in "the referral of inmates" to housing. *Id.* The County contends that this definition encompasses Nurse McKnight. Reply in Supp. of Mot. to Dismiss [ECF 71] at 5.

Though Nurse McKnight is technically not a correctional officer, I find that she meets or exceeds the skillset required for an individual to qualify as mental health-trained staff. By "provid[ing] receiving screening" and "administer[ing] or deliver[ing] mental health medication," Nurse McKnight fulfills the job duties of the NCCHC's definition. Dreveskracht Decl. [ECF 64] Ex. 29 at 75. Moreover, she is a registered nurse with years of experience dealing with inmate medical and behavioral issues and had received training on assessing suicidal ideation. Dreveskracht Decl. [ECF 64] Ex. 10 at 16:18–24, 61:17–62:1, 67:2–68:5.

But even if the County's screening policies did not comply exactly with NCCHC standards, I would nevertheless find the policies did not constitute deliberate indifference. Pursuant to County policy, three individuals assessed Mr. Hanington's suicide risk: Nurse McKnight, Deputy Schneider, and Deputy Epifano. All three evaluators had received suicide prevention training. Dreveskracht Decl. [ECF 64] Ex. 10 at 61:17–62:1; Mot. for Summ. J. [ECF 53] Ex. A at 7:6–14; *id.* Ex. G at 13:4–19. In addition to assessing his suicide risk holistically, all three asked Mr. Hanington whether he had attempted suicide and whether he was thinking about suicide. Dreveskracht Decl. [ECF 64] Ex. 2 at 2–3; *id.* Ex. 16 at 3–4. Had Mr. Hanington survived the night, he would have received another assessment, this time from a mental health

professional. These precautions do not suggest the County acted unreasonably or recklessly. As a result, I find that the County's policies related to medical and mental health screening did not show deliberate indifference to Mr. Hanington's right to receive adequate medical care.

### 2. Training

The Haningtons contend that "the County 'failed to have adequately trained staff.'" Resp. to Mot. for Summ. J. [ECF 63] at 32–33 (quoting Gravette Decl. [ECF 66] ¶7(b)). The Haningtons base this argument on a declaration from their corrections expert, Tim Gravette. Gravette asserts that Multnomah County staff did not properly diagnose or screen Mr. Hanington and that there was "no evidence that [his] gatekeepers were mental health trained." Gravette Decl. [ECF 66] ¶7(b).

This argument largely overlaps with the Haningtons' previous argument that the County's screening procedures were inadequate because no one present was a mental health professional. As discussed earlier, *supra* Part I(B)(1), Nurse McKnight is a registered nurse with experience diagnosing mentally ill detainees. Moreover, Deputy Schneider and Deputy Epifano had both received suicide prevention training. Even the Haningtons' correctional healthcare expert, Rebecca Luethy, recognized that "jail staff were trained to identify and respond to risk factors for self-harm and suicide." Luethy Decl. [ECF 65] ¶7. Because Gravette based his conclusion on an inaccurate assessment of the record, it cannot create a dispute of fact as to whether the County's training was sufficient.

Even if I were to interpret Gravette as meaning to say that there was no evidence that Mr. Hanington's gatekeepers were *adequately* mental health-trained, his declaration provides no basis for such a conclusion. Instead of pointing to a standard of care that the County failed to meet or a specific kind of training that the County failed to give, Gravette declares that Mr.

Hanington's death itself is evidence of inadequate training. Gravette Decl. [ECF 66] ¶7(b). Such conclusory allegations are insufficient to survive summary judgment. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").

### 3.  Security and Welfare Checks

The Haningtons argue that Multnomah County's policy for conducting its security and welfare checks also showed deliberate indifference to Mr. Hanington's right to "direct-view safety checks." Resp. to Mot. for Summ. J. [ECF 63] at 30–31 (quoting *Gordon*, 6 F.4th at 973). To argue that Multnomah County's policy was deficient, the Haningtons again cite to Gravette, who states that the medical unit should have received close monitoring, with checks every 15 minutes by specially trained deputies. *Id.* at 30 (quoting Gravette Decl. [ECF 66] ¶ 7(e)(ii)). Gravette also points to guidelines from the American Correctional Association (ACA) requiring certain inmates to be "personally observed by a correctional officer at least every thirty minutes on an irregular schedule." *Id.*

The County's security check policy in the medical dorm was to check each dorm twice every hour at irregular intervals. Mot. for Summ. J. [ECF 53] Ex. N at 5:1–2. This standard amounts to slightly less often than the ACA standard that the Haningtons endorse. But the ACA standard would not apply to the County or Mr. Hanington. Multnomah County is accredited by the NCCHC, not the ACA. *See* Dreveskracht Decl. [ECF 64] Ex. 49 at 1. And even if ACA standards did apply, the "every thirty minutes" observation requirement applies only to "special management inmates," who are inmates required to be segregated from other prisoners for security purposes. *See* Weiner Decl. [ECF 72] Ex. 1 at 7–8. The Haningtons do not explain why such standards would apply in the context of the medical dorm where Mr. Hanington was

housed. Thus, the Haningtons have failed to identify a genuine dispute of material fact as to whether the County's monitoring policies deviated from the ACA standard of care.

The County's monitoring policies do deviate from the 15-minute checks suggested by Gravette. Gravette Decl. [ECF 66] ¶7(e)(ii). Yet Gravette provides no explanation as to how he arrived at this number. More importantly, he fails to indicate any evidence that the County should have known of this standard. Without at least constructive knowledge that its welfare check procedures were inadequate, the County could not have been deliberately indifferent.

Furthermore, I find that the County's policy was objectively reasonable. The County's policies went beyond the statutory requirement of "at least once each hour" under Or. Rev. Stat. § 169.076(1) and facilitated frequent welfare checks on patients with medical needs. If patients found themselves in a medical emergency, they had means to call for assistance from their cells. Mot. for Summ. J. [ECF 53] Ex. N at 5:2–8. Had the County known of Mr. Hanington's bipolar disorder and previous suicide attempt, Dreveskracht Decl. [ECF 64] Ex. 27 at 2, more extensive monitoring would have been necessary. But based on the risks of which the County was aware, I find the County's welfare checks sufficient. In sum, the Haningtons have failed to demonstrate that the County had constructive knowledge that its monitoring policies in its medical unit were substantially certain to result in inadequate treatment. *See Sandoval*, 985 F.3d at 682–83.

### 4. Suicide Intervention

The Haningtons challenge the County's policy for providing emergency aid. Resp. to Mot. for Summ. J. [ECF 63] at 31–32. The County warns officers against "placing themselves at risk of becoming a hostage, or victim." Weiner Decl. [ECF 54] Ex. 9 at 3. To mitigate this risk, the County recommends its corrections officers never enter an inmate's cell alone. Mot. for Summ. J. [ECF 53] Ex. E at 8:20–22; *id.* Ex. M at 2:18–25. Deputy Kame followed this policy

when she saw Mr. Hanington's body in his cell. *Id.* Ex. L at 5:3–11. Rather than enter immediately, she called for backup, waited thirty seconds for it to arrive, and then entered. *Id.* at 5:10–15; Weiner Decl. [ECF 72] Ex. 4 at 2–4. The Haningtons provide expert testimony that—though brief—this delay could have cost Mr. Hanington his life. Luethy Decl. [ECF 65] ¶7(a).

But causation is the only element the Haningtons allege to prove their *Monell* claim. Resp. to Mot. for Summ. J. [ECF 63] at 31–32. Instead of addressing deliberate indifference, they claim that a moving force "is all that is required to substantiate a *Monell* claim." *Id.* at 32 (citing *Dees v. Cnty. of San Diego*, No. 14-0189-BEN-DHB, 2017 WL 168569, at *2 (S.D. Cal. Jan 17, 2017); 9th Cir. Model Civ. Jury Ins. § 9.4). This is incorrect. The Haningtons rely on a case that discusses Ninth Circuit Model Civil Jury Instruction § 9.4, which, on its own, does not require a showing of deliberate indifference. However, Instruction § 9.4 explains that "it should be used in conjunction with an applicable 'particular rights' instruction that states the additional elements a plaintiff must establish to prove the violation of the particular constitutional rights at issue." *Dees*, 2017 WL 168569, at *2. Here, that instruction would be Instruction § 9.30, which discusses the elements of proving the violation of an inmate's rights to medical care under the Fourteenth Amendment. Those elements are the same ones that *Castro* outlined for establishing objective deliberate indifference. *Compare* 9th Cir. Model Civ. Jury Ins. § 9.30 *with Castro*, 833 F.3d at 1070. Thus, causation alone cannot support a *Monell* claim.

At oral argument, the Haningtons seemingly abandoned this theory, instead claiming that the constitutional violation here was sufficiently obvious to imply deliberate indifference. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013) ("[F]ailing to provide . . . life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference."). Courts may "infer the existence of" deliberate

indifference when "the risk of harm is obvious," *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), but

they only do so when there is "no reasonable justification for exposing the inmate to the risk,"

*Lemire*, 726 F.3d at 1078.

Even assuming that the County's emergency intervention policy imposed obvious risks

on inmates, the County has provided a compelling justification for the policy: ensuring the safety

of its officers. "[T]he problems that arise in the day-to-day operation of a corrections facility are

not susceptible of easy solutions." *Bell*, 441 U.S. at 547. With its emergency intervention policy,

the County tried to balance two important interests: the need to provide prompt assistance to its

inmates and the need to protect its employees. Such a policy may not always result in an ideal

outcome. But I do not find that such a policy reveals deliberate indifference. *See Kingsley*, 576

U.S. at 399–400 ("[A]s part of the objective reasonable analysis . . . [,] deference to policies and

practices needed to maintain order and institutional security is appropriate.").

### 5.  Understaffing[3]

The Haningtons claim that the County had a practice of understaffing its facilities. Resp.

to Mot. for Summ. J. [ECF 63] at 32. They base this allegation on several documents. The first is

a 2015 NCCHC report, which found that MCIJ failed to meet several NCCHC guidelines.

Dreveskracht Decl. [ECF 64] Ex. 50–51. But according to a subsequent report in 2016, the

County quickly remedied these issues. Weiner Decl. [ECF 72] Ex. 2 at 1.[4]

---

[3] The Haningtons similarly allege that audits found that the County was overcrowded. Resp. to Mot. for Summ. J. [ECF 63] at 32. Yet the audits they refer to do not describe any problem with overcrowding at any County facility. *See* Dreveskracht Decl. [ECF 64] Exs. 50–53. It appears the Haningtons have conflated overcrowding with understaffing. *See* Resp. to Mot. for Summ. J. [ECF 63] at 32. As a result, I discuss only understaffing.

[4] The Haningtons point out that the 2016 report on the County was based in part on two altered documents. Resp. to Mot. for Summ. J. [ECF 63] at 15 (citing Dreveskracht Decl. [ECF 64] Ex. 49). But the County informed NCCHC of the errors, permitted additional audits over the course of 2017, and were found fully compliant with NCCHC guidelines in September 2017. Dreveskracht Decl. [ECF 64] Ex. 49.

The second document is an external audit of the County's staffing and operations from May 2017. Dreveskracht Decl. [ECF 64] Ex. 52. This audit made several recommendations to the County, including changes to staffing scheduling software, proactive recruiting, more flexible assignment of job tasks, and improving communication to boost morale. *Id.* at 9–10, 15. It also recommended an increase in staffing to maximize open clinic hours. *Id.* at 14–15. Though it suggested ways the County could optimize its operations, the audit did not find the County was understaffed in a way that fell below any necessary standard of care. The mere fact that more staff would have been beneficial to the County does not mean that the County was understaffed. As such, this document also fails to demonstrate a practice of understaffing.

The third document is a 2015 report from the Multnomah County Corrections grand jury. *Id.* Ex. 53. That report highlighted an issue with staffing in the Multnomah County courthouse. *Id.* at 14, 18–20. It found that the County "has difficulty anticipating" the courts' staffing needs, and that understaffing at the courthouse can cause "significant courtroom delays" while judges and attorneys wait for deputies to deliver inmates to their courtrooms. *Id.* at 19. That the County had issues transporting inmates to courtrooms in the Multnomah County courthouse in 2015 has no relevance to its staffing practices for inmates detained in MCDC or MCIJ.

The Haningtons have submitted no viable evidence that the County had a practice of understaffing at the time of Mr. Hanington's death. Without evidence of such a practice, it cannot be the basis of a *Monell* claim at summary judgment.

### C. Claims Against Individual Defendants

To prevail on a Fourteenth Amendment inadequate medical care claim against an individual defendant, a plaintiff must establish: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put

the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon I*, 888 F.3d at 1125. The third element requires the plaintiff to show "the defendant's conduct" was "objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro*, 833 F.3d at 1071).[5]

Defendants assert that the individual defendants are protected by qualified immunity. Mot. for Summ. J. [ECF 53] at 28–29. Under the doctrine of qualified immunity, those acting under color of law are protected from liability unless "their conduct . . . violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Thus, even when state actors violate the constitution, they cannot be held civilly liable unless they violated a right that was clearly established. *CarePartners, LLC v. Lashway*, 545 F.3d 867, 876 (9th Cir. 2008). "[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). A clearly established right must be defined "with specificity and not at a high level of generality." *Gordon v. Cnty. of Orange (Gordon II)*, 6 F.4th 961, 968 (9th Cir. 2021) (cleaned up).

---

[5] At several points in her declaration, the Haningtons' correctional healthcare expert, Rebecca Luethy, opines that the County's policies and the actions of certain individual defendant were "objectively unreasonable." *See* Luethy Decl. [ECF 65] ¶¶ 4(a)(iii), 4(a)(iv), 4(e), 5(a), 7, 7(a), 9. Because objective unreasonableness is a legal question, Luethy's opinion on it is ultracrepidarian and has no weight.

In their response to Defendants' motion for summary judgment, the Haningtons voluntarily dismiss their claims against several individual defendants. Resp. to Mot. for Summ. J. [ECF 63] at 23 n.106. Thus, the remaining individual defendants are Sheriff Michael Reese, Chief Deputy of Corrections Michael Shults, MCIJ Captain Steven Alexander, MCIJ Lieutenant Curtis Sanders, Corrections Commander Raimond Adgers, Nurse McKnight, and Deputy Kame. The first four defendants I address jointly as supervisory defendants; I then discuss Nurse McKnight and Deputy Kame individually.

## 1. Supervisory Defendants

### a. Constitutional Violation

Defendants Reese, Shults, Alexander, Sanders, and Adgers all held supervisory positions with the County when Mr. Hanington died. A supervisory official may be held liable under § 1983 if he was either (1) personally involved in the constitutional deprivation, or there is (2) "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 798 (9th Cir. 2018) (internal quotation marks omitted). This "causal connection can be established by setting in motion a series of acts by others or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* (cleaned up).

The Haningtons argue that Reese, Shults, Alexander, and Sanders are liable under § 1983 because they "ratified" their employees' treatment of Mr. Hanington. Resp. to Mot. for Summ. J. [ECF 63] at 34. This ratification is merely the supervisory defendants stating after-the-fact that they believe their employees acted in accordance with County policy. Dreveskracht Decl. [ECF 64] Ex. 5 at 11:24–12:3 (Alexander); *id.* Ex. 6 at 10:5–12 (Reese); *id.* Ex. 11, at 10:5–13

(Sanders) *Id.* Ex. 8 at 8:2–10 (Shults). Such evidence fails to show any kind of personal involvement or causal connection.

As for Adgers, the Haningtons argue he should be held liable under § 1983 for promulgating policies and practices that led to Mr. Hanington's death. Resp. to Mot. for Summ. J. [ECF 63] at 34–35. Yet they provide no evidence detailing Adgers's specific involvement in any of the policies related to Mr. Hanington's death beyond his general job duty of "promulgating jail policy." *Id.* (citing Dreveskracht Decl. [ECF 64] Ex. 8 at 7:5–9). As such, the Haningtons have failed to put on evidence of any specific action that Adgers took. A jury could not reasonably infer Adgers was involved in any of the policies at issue based on his job description alone. Moreover, I have found that none of the County's policies amount to deliberate indifference to Mr. Hanington's rights. Consequently, promulgating those policies would not constitute objective deliberate indifference.

### b. Clearly Established Right

In their discussion of qualified immunity, the Haningtons do not mention the supervisory defendants at all. *See* Resp. to Mot. for Summ. J. [ECF 63] at 25–27. Because the Haningtons have provided no case to suggest that the allegedly violated right was clearly established, they have failed to "prove that precedent on the books at the time the officials acted would have made clear to them that their actions violated the Constitution." *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016) (cleaned up). Thus, even if the supervisory defendants had violated Mr. Hanington's constitutional rights, they would still be entitled to qualified immunity.

### 2.  Nurse Cynthia McKnight

#### a.  Constitutional Violation

The Haningtons allege Nurse McKnight violated Mr. Hanington's right to receive adequate medical care by failing to recommend him for suicide watch. Resp. to Mot. for Summ. J. [ECF 63] at 23–24. Specifically, the Haningtons point to an apparent contradiction on Nurse McKnight's assessment form for Mr. Hanington: she indicated on the form that Mr. Hanington did not "appear[] overly anxious, panicked, afraid, or angry," but then wrote as a comment on the bottom of the form that he was "very anxious." Dreveskracht Decl. [ECF 64] Ex. 16 at 4.

The Haningtons take Nurse McKnight's comment that Mr. Hanington was "very anxious" out of context. Nurse McKnight wrote that Mr. Hanington was very anxious about his blood sugar levels, not that he generally appeared anxious in a way that would indicate he was a suicide risk. *Id.*; Mot. for Summ. J. [ECF 53] Ex. H at 11:21–13:1. That Mr. Hanington did not appear overly anxious lines up with Deputy Epifano's description of Mr. Hanington's demeanor during his evaluation. *See* Mot. for Summ. J. [ECF 53] Ex. G at 3:1–9.

Through a letter to the court following oral argument, the Haningtons raised another issue with Nurse McKnight's evaluation of Mr. Hanington: she did not know that Mr. Hanington was a sex offender. A closer look at her deposition reveals that Nurse McKnight had access to Mr. Hanington's criminal history, but she deliberately ignored it. Dreveskracht Decl. [ECF 64] Ex. 12 at 28:20–29:3; Mot. for Summ. J. [ECF 53] Ex. H at 8:10–18. An inmate's criminal history can shed valuable light on his state of mind and tendency to self-harm. *See* Luethy Decl. [ECF 65] ¶ 4(a)(ii); Dreveskracht Decl. [ECF 64] Ex. 3. By ignoring it, Nurse McKnight hamstringed her ability to evaluate patients' suicide risks.

Turning to the elements of objective deliberate indifference outlined in *Gordon I*, 888 F.3d at 1125, I find that, for the purposes of summary judgment, the Haningtons have provided sufficient evidence to support an inference that Nurse McKnight violated Mr. Hanington's right to receive adequate medical care. First, Nurse McKnight made a conscious decision to ignore Mr. Hanington's criminal history. Second, this decision heightened the likelihood that Mr. Hanington's suicidal tendencies would go undetected. Third, a jury could reasonably find that Nurse McKnight failed to take reasonable available measures to mitigate the risk of failing to consider Mr. Hanington's criminal history. And fourth, a jury could reasonably find that, if Nurse McKnight had considered Mr. Hanington's criminal history, she would have placed him on suicide watch and that doing so would have prevented his death. Thus, the Haningtons have presented a genuine fact dispute as to whether Nurse McKnight violated Mr. Hanington's right to receive adequate medical care.

### b.  Clearly Established Right

For the purposes of qualified immunity, Mr. Hanington's allegedly violated right must be defined more narrowly than a general right to receive adequate medical care. *See Gordon II*, 6 F.4th at 968. The Haningtons define the right that Nurse McKnight violated as a right to "a proper medical screen to ensure the appropriate protocol was initiated." Resp. to Mot. for Summ. J. [ECF 63] at 26–27. But the cases that the Haningtons claim establish this right are all "materially distinguishable." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).

In *Snow v. McDaniel*, the Ninth Circuit held that a jury could reasonably find that prison medical staff violated a prisoner's rights by prescribing pharmacological treatment against the recommendation of outside specialists. 681 F.3d 978, 988 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Ultimately, the physicians

withheld the recommended surgical treatment for three years. *Id.* Here, Nurse McKnight had no external recommendation and knew Mr. Hanington for no more than a few hours. Thus, *Snow* is readily distinguishable.

In *Gibson v. County of Washoe, Nevada*, a nurse was aware that an inmate was "in the throes of a manic state," had observed him "exhibiting behavior consistent with mental illness," and knew that he was in possession of psychotropic medication. 290 F.3d 1175, 1194–96 (9th Cir. 2002). Nevertheless, the nurse took no action to treat him. *Id.* The Ninth Circuit found at summary judgment a jury could reasonably find her inaction violated the Constitution. *Id.* at 1194. Unlike the nurse in *Gibson*, Nurse McKnight had only faint indications of Mr. Hanington's suicide risk. Nurse McKnight knew that Mr. Hanington was worried about his blood sugar and had constructive knowledge of his sex offenses. But these indicators pale in comparison to the bright warning signs that were before the nurse in *Gibson*. The Haningtons' reliance on *Gibson* is therefore misplaced.

Likewise, in *Johnson v. Mason County*, jail staff "did almost nothing," in the face of an inmate who "jail personnel, mental health professionals, and other inmates were aware" was in the midst of a "mental health crisis." No. C14-5832RBL, 2017 WL 750061, at *2–3 (W.D. Wash. 2017). Audible "cries for help" from the inmate and repeated warnings of his suicidal tendencies from his grandmother fell on deaf ears. *Id.* at *1. As with *Gibson*, *Johnson* presents an inmate that clearly needed urgent mental health care. Nurse McKnight faced no such signs of Mr. Hanington's mental illness.

At oral argument, the Haningtons cited to *Williams v. Grant County*, No. 2:15-CV-01760-SU, 2016 WL 4745179 (D. Or. Sept. 12, 2016). Like *Johnson* and *Gibson*, *Williams* involved a county that did little in the face of clear signs of an inmate's suicidal tendencies. The

inmate and his son had "repeatedly informed deputies" that the former "was experiencing suicidal thoughts." *Id.* at *6. Here, Mr. Hanington repeatedly denied suicidality.

Accordingly, I find that no case cited by the Haningtons shows that Mr. Hanington had a clearly established right to receive a suicide risk assessment that took his criminal history into account.

Nor do I find that the general rule requiring adequate medical care applies "with obvious clarity to the specific conduct in question." *Hope*, 536 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts have only recognized "obvious" constitutional violations in particularly depraved circumstances. For example, in *Hope*, the Supreme Court recognized "[t]he obvious cruelty" of handcuffing an inmate to a hitching post "to inflict gratuitous pain or discomfort." 536 U.S. at 745–47. And in *Taylor v. Riojas*, the Supreme Court found qualified immunity did not protect officers who had held an inmate in a cell "covered . . . in massive amounts of feces" for four days and a frigid cell "teeming with human waste" for another two. 141 S. Ct. 52, 53 (2020) (per curiam) (cleaned up).

Such malice is not present here. In essence, Nurse McKnight failed to give credence to one of many factors related to an individual's tendency to commit suicide. Her failure to employ specialized knowledge is not an obvious constitutional violation. Moreover, the information available to Nurse McKnight—his demeanor, criminal history, and medical condition—does not suggest that Mr. Hanington was an obvious suicide risk. As a result, qualified immunity shields Nurse McKnight from § 1983 liability.

### 3. Deputy Trudy Kame

#### a. Constitutional Violation

The Haningtons allege that Deputy Kame violated Mr. Hanington's right to receive adequate medical care by calling for backup before entering his cell. Resp. to Mot. for Summ. J. [ECF 63] at 24–25. Though this amounted to a delay of only thirty seconds, Weiner Decl. [ECF 72] Ex. 4 at 2–3, those thirty seconds could have been the difference between life and death for Mr. Hanington, Luethy Decl. [ECF 65] ¶7(a).

Deputy Kame "delay[ed] . . . medical treatment," which may indicate deliberate indifference. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) ("Indifference *may* appear when prison officials . . . delay . . . medical treatment.") (internal quotation marks omitted) (emphasis added). Turning to the *Gordon I* test, Deputy Kame "made an intentional decision" to delay treatment, which put Mr. Hanington at an elevated "risk of suffering serious harm." 888 F.3d at 1125. However, in waiting for backup, Deputy Kame acted reasonably. She had a legitimate concern that Mr. Hanington could have been feigning an emergency so that he could attack her. Mot. for Summ. J. [ECF 53] Ex. L at 5:5–15. And Deputy Kame took "reasonable available measures to abate" the risk of delayed treatment by calling for backup, waiting for only a brief period, and providing aid as soon as backup arrived. *Gordon I*, 888 F.3d at 1125. Thus, she did not act with objective deliberate indifference.

#### b. Clearly Established Right

Even if Deputy Kame had violated Mr. Hanington's right to due process, the Haningtons have failed to show that right was clearly established in this context. The Haningtons define the right that Deputy Kame supposedly violated as a right to receive "prompt life-saving medical care." Resp. to Mot. for Summ. J. [ECF 63] at 26–27. Yet this definition is too broad, as

evidenced by the marked distinctions between the facts here and the facts of the cases the Haningtons claim establish this right.

In *Snow*, the defendant physicians delayed treatment for three years. 681 F.3d at 988. Deputy Kame delayed treatment for 30 seconds. Whereas the former implies prolonged neglect, the latter implies the kind of split-second emergency decision that courts are reticent to second-guess. *See Tennessee v. Garner*, 471 U.S. 1, 20 (1985); *Bingue v. Prunchak*, 512 F.3d 1169, 1175 (9th Cir. 2008).

At first blush, the facts of *Lemire* have much in common with those of this case. Corrections officers discovered an inmate who had hung himself but did not immediately administer treatment. 726 F.3d at 1082. However, critical differences make *Lemire* inapplicable to Deputy Kame's circumstances. In *Lemire*, the two corrections officers ostensibly sat on their hands for the ten minutes before they called medical personnel and the five minutes while they waited for medical personnel to arrive. *Id.* Conversely, Deputy Kame was alone when she discovered Mr. Hanington and provided emergency aid as soon as she received backup from another officer, who was a mere thirty seconds away. Furthermore, whereas the officers in *Lemire* ostensibly had no reason to withhold treatment, *id.*, Deputy Kame had legitimate safety concerns about entering Mr. Hanington's cell on her own. Thus, *Lemire* is distinguishable.

I also find that Deputy Kame's conduct was not "obvious[ly]" unconstitutional. *Hope*, 536 U.S. at 741. Deputy Kame had a reasonable concern that Mr. Hanington could have harmed her or taken her as a hostage had she entered his cell on her own. She made a logical decision to wait for backup, weighing the risk to her safety against Mr. Hanington's need for urgent care. That Mr. Hanington was peaceable was not obvious to Deputy Kame upon discovering him. *See* Mot. for Summ. J. [ECF 53] Ex. L at 5:5–10. Nor was it obvious that waiting for backup could

have been determinative to whether Mr. Hanington survived. *See id.* at 4:22–5:2 (finding Mr. Hanington in a sitting position next to his bed).

Even if Deputy Kame's actions were unconstitutional, their unconstitutionality was in no way clearly established. Thus, Deputy Kame is entitled to qualified immunity.

### D.  Loss of Familial Association

#### 1.  Robin Hanington's Standing

As a preliminary matter, Defendants argue that Ms. Hanington cannot make an independent Fourteenth Amendment claim as Mr. Hanington's wife. Though the Ninth Circuit has recognized that parents and children may make a Fourteenth Amendment claim for loss of companionship and society, *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010), it has not explicitly made such a claim available for spouses. Nevertheless, the majority of the district courts in this circuit to tackle the question have found that spouses have a right to familial association. *See, e.g., Est. of Brown v. Lambert*, 478 F. Supp. 3d 1006, 1022 (S.D. Cal. 2020); *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1274 (E.D. Cal. 2012); *Cosby v. City of Oakland*, No. C-97-0267 MHP, 1997 WL 703776, at *5 n.6 (N.D. Cal. Oct. 28, 1997). Defendants rely on *Lee v. County of Los Angeles*, which declined to recognize a spouse's right to familial association due to the Supreme Court's "reluctan[cy] to expand the concept of substantive due process." No. CV 16-2039 DSF, 2018 WL 6016992, at *3 (C.D. Cal. Mar. 6, 2018) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

Particularly in the wrongful death context, I see little difference between the loss of familial association experienced by children or parents and the loss experienced by spouses. All have been permanently deprived of a "deep attachment[] and commitment[]" to a family member with whom they "shar[ed] not only a special community of thoughts, experiences, and beliefs but

also distinctively personal aspects of [their] li[ves]." *Lee v. City of L.A.*, 250 F.3d 668, 685 (9th Cir. 2001) (quoting *Bd. of Dirs. v. Rotary Club*, 481 U.S. 537, 545 (1987)). Because any expansion of substantive due process here is minimal and justified, I find that the Fourteenth Amendment affords Ms. Hanington a right of familial association.

### 2. Merits

To prevail on their loss of familial association claim, the Haningtons must show that Defendants engaged in behavior "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 & n.8 (1998); *Wilkinson*, 610 F.3d at 554. Before *Castro*, this entailed a generic deliberate indifference standard. *Lemire.*, 726 F.3d at 1075 (9th Cir. 2013). However, because the loss of familial association is a Fourteenth Amendment right, the objective deliberate indifference standard recognized in *Castro* now applies. *See Gordon I*, 888 F.3d at 1124–25. Thus, the Haningtons' familial association claim must meet the same evidentiary standard as the rest of their § 1983 claims.

To support their familial association claim, the Haningtons rely on the evidence and arguments adduced in support of their other § 1983 claims. Resp. to Mot. for Summ. J. [ECF 63] at 35–36. Those claims fail, *supra* Part I(B), so the familial association claim fails with them.

### II. Negligence Claims

Having found that none of the Haningtons' § 1983 claims survive summary judgment, I am left with the Haningtons' common law negligence claims.[6] The Haningtons voluntarily

---

[6] Because I have dismissed all of the Haningtons' claims conferring federal jurisdiction and there is no diversity jurisdiction in this case, I must decide whether to exercise supplemental jurisdiction over the Haningtons' remaining state law claims. *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997). Because the case has already gone through extensive discovery and the Haningtons' negligence claims are intertwined with their § 1983 claims, I find that exercise of supplemental jurisdiction best serves the interests of justice.

dismiss all individual defendants from their negligence claim. Resp. to Mot. for Summ. J. [ECF 63] at 36 n.147. This leaves Multnomah County as the sole defendant. Under Oregon law, a government entity may be held liable for "its torts and those of its officers, employees and agents acting within the scope of their employment duties." Or. Rev. Stat. § 30.265(1).

To prevail on a negligence claim under Oregon law, the plaintiff must show "the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff." *Chapman v. Mayfield*, 361 P.3d 566, 572 (Or. 2015) (en banc). However, this standard may be altered if "the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty." *Id.* at 571 (quoting *Fazzolari v. Portland Sch. Dist. No. 1J*, 734 P.2d 1326, 1336 (1987)).

One of these relationships is that of inmates and their jailors. *Nordenstrom*, 2021 WL 2546275, at *20 (D. Or. June 18, 2021). Deputies must "care for the prisoners in their custody and generally protect them from harm." *Crane v. United States*, No. 3:10-cv-00068-AC, 2013 WL 1453166, at *5 (D. Or. Mar. 21, 2013); *see also* Or. Rev. Stat. § 169.140 ("[L]ocal correctional facility shall . . . supply . . . necessary medical aid."). In practical terms, I find that the County had a duty to comply with its own policies, relevant licensing standards, and the general standard of care for its industry. Many of these standards impose affirmative duties on the County.

The Haningtons claim that the County—through its policies and the actions of its employees—violated its duty to Mr. Hanington in seven ways that would foreseeably cause harm. Resp. to Mot. for Summ. J. [ECF 63] at 38 (citing Gravette Decl. [ECF 66] ¶7). These

arguments are largely based on the declaration of their corrections expert, Tim Gravette. I address each argument in turn.

### A. Consideration of Sex Offender Status

First, Gravette opines that the County failed to follow its own procedures by failing to "giv[e] due consideration to the suicidal danger he was subject to based on his charges as a sex offender." Gravette Decl. [ECF 66] ¶ 7(a). However, the County's procedure is to weigh an individual's sex offender status in the totality of the circumstances. Mot. for Summ. J. [ECF 53] Ex. N at 2:4–7; *see also* Dreveskracht Decl. [ECF 64] Ex. 3. Thus, the policy itself is not negligent.

However, Nurse McKnight admitted that she did not take Mr. Hanington's criminal history into account when weighing his suicide risk. Mot. for Summ. J. [ECF 53] Ex. H at 8:10–18. By failing to consider an important suicide risk factor, Nurse McKnight breached her duty to provide an accurate suicide risk assessment pursuant to County policies. Moreover, it is foreseeable that such a breach would cause Nurse McKnight to underestimate Mr. Hanington's suicide risk and fail to recommend him for suicide watch. And it is also foreseeable that Mr. Hanington would not have committed suicide had he been placed on suicide watch. The Haningtons have thus provided sufficient evidence to show that Nurse McKnight was negligent. And because Nurse McKnight conducted this negligent suicide risk assessment as part of her duties as an employee for the County, the County may be held liable.

### B. Mental Health Training

Second, Gravette claims the County did not train its employees. Gravette Decl. [ECF 66] ¶ 7(b). He says there is "no evidence" that those who screened Mr. Hanington were "mental health trained," failing to explain what he means by that term. *Id.* But, as discussed above, *supra*

Part I(B)(1), those who screened Mr. Hanington had all received suicide prevention training and fit under the NCCHC definition of mental health-trained correctional staff. Gravette's statements that the County's training was inadequate are conclusory and unsupported.

### C. Training for Security and Welfare Checks

Third, Gravette argues the County failed to train staff to responsibly conduct security and welfare checks. *Id.* ¶ 7(d). I previously found that the County's policy of two checks an hour is reasonable and meets relevant statutory and licensing standards. Furthermore, the County is entitled to "apparent authority" immunity for its good-faith interpretations of the law. Or. Rev. Stat. § 30.265(6)(f). The Haningtons have provided no evidence that the County's interpretation of Or. Rev. Stat. § 169.076(1) was in bad faith, so apparent authority immunity applies here as well.

### D. Monitoring of Security and Welfare Checks

Gravette says that the County should have had senior staff monitoring its deputies "to ensure that they were conducting their duties in a responsible manner." Gravette Decl. [ECF 66] ¶7(e). As an example, he says that deputies should "look carefully with their focus being on inmate behavior instead of merely passing quickly by each window." *Id.* But he provides no evidence that having senior monitoring staff is required by a standard of care. His allegation that deputies "merely pass[ed] quickly by each window" is also unsupported by the record. *Id.* Nothing indicates Deputy Kame performed only cursory check-ins. On the contrary, at one point Deputy Kame recognized that Mr. Hanington had been awake all night and checked in with him verbally. Mot. for Summ. J. [ECF 53] Ex. L at 3:2–6.

Similarly, Gravette claims that Deputy Kame did not properly document her welfare patrols. Gravette Decl. [ECF 66] ¶ 7(e). He bases this assertion on evidence that Deputy Kame

logged her security checks before she made them. *Id.* ¶ 7(e)(i). But even if doing so violated a relevant standard of care, the Haningtons do not point to any causal connection between Deputy Kame's clumsy recordkeeping and Mr. Hanington's death.

### E. Oregon State Sheriff's Association Standards

Gravette lists standards from the Oregon State Sheriff's Association that he contends the County did not meet. *Id.* ¶7(f). The first standard is that the County "failed to gather information from the U.S. Marshall's [sic] transportation officer." *Id.* ¶7(f)(i). This is true; evidence supports an inference that the arresting officer did not complete the intake form properly. Dreveskracht Decl. [ECF 64] Ex. 2 at 2. Thus, the county breached its duty to obtain that form.

However, the Haningtons fail to point to facts that would make Mr. Hanington's suicide a foreseeable result of that breach. Instead, the causal link here is purely speculative. Gravette says that the transportation officer "*may have* provided relevant information with respect to medical or self-harm red flags." Gravette Decl. [ECF 66] ¶7(f)(i) (emphasis added). He fails to identify what those red flags could have been. Nothing in the record suggests that Mr. Hanington's behavior at arrest was any different from his behavior while detained. In other words, the Haningtons do not point to information that the arresting marshal would have had that would have impacted Mr. Hanington's later suicide assessments.

The second and third Sheriff's Association standards that Gravette addresses are the requirement that deputies "look for signs of medical issues or suicide" and that they conduct suicide risk screening *Id.* ¶7(f)(ii)–(iii). The County complied with this standard by conducting three medical and suicide risk assessments.

Gravette also contends that the County failed to segregate Mr. Hanington "during admission and housing when inmates are obviously vulnerable to being assaulted." *Id.* ¶7(f)(iv).

Again, even if this standard was breached, the Haningtons have failed to point to any kind of causal connection between the supposed breach and Mr. Hanington's suicide.

### F. Emergency Intervention Policies

Gravette posits that the County's policy of requiring backup staff before entering a prison cell and Deputy Kame's adherence to that policy were not reasonable. *Id.* ¶7(g). Gravette does not discuss the County's justification for the policy: protecting its deputies. As discussed earlier, *supra* Part I(B)(4), (C)(3), I find that the County's emergency intervention policy and Deputy Kame's application of it to be reasonable.

### G. MCSO National Accreditation

Gravette claims that the County failed to receive proper NCCHC accreditation. *Id.* ¶7(h). As established above, *supra* note 5, the County was fully accredited by the NCCHC at the time of Mr. Hanington's death.

### H. Internal Recommendations

Lastly, Gravette argues the County failed to abide by its own recommendations for inmate safety. *Id.* ¶7(i). He cites to an internal study from the County finding need for improvement in several key areas, including communication among different departments and training for dealing with inmates with mental illnesses. *Id.* Gravette fails to connect this report to Mr. Hanington's death beyond mere proximity in time. The County was not bound by its goals in the report, nor does Gravette link any specific deficiency found in the report to a problem that contributed to Mr. Hanington's death.

## CONCLUSION

For the reasons given above, I grant in part and deny in part Defendants' motion for summary judgment [ECF 53]. I dismiss all the Haningtons' claims, save for their claim that the

County—by way of Nurse McKnight—acted negligently by failing to consider Mr. Hanington's sex offender status during his medical assessment.

IT IS SO ORDERED.

DATED this _____ day of March, 2022.

MICHAEL W. MOSMAN
Senior United States District Judge